UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL CASE NO.: 1:18-CV-00054-GNS

THOMAS C. BUTZ; and
SHAWN C. BUTZ                                          APPELLANTS/CROSS-APPELLEES

v.

CLARENCE CAMPBELL; and
DONNA CAMPBELL                                         APPELLEES/CROSS-APPELLANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on appeal and cross-appeal from the United States Bankruptcy Court for the Western District of Kentucky. The issues have been briefed and the matter is ripe for adjudication. For the reasons provided below, the Bankruptcy Court's decision is **AFFIRMED IN PART** and **REVERSED IN PART**.

### I.     BACKGROUND

In 2009 and early 2010, Appellants/Cross-Appellees Thomas and Shawn Butz ("Thomas" and "Shawn", collectively "Debtors") began discussing the idea of opening a boutique shop selling flip-flops featuring "popits." (Trial Tr. 12:25-13:3, DN 4). Popits are interchangeable charms that attach to the thong of flip flops and feature an assortment of designs. (Trial Tr. 13:5-9). The popit brand was entirely web-based when Shawn met its owner, Donald Ray ("Ray"), and discussed with him opportunities for opening a brick-and-mortar store in either Las Vegas or Hawaii. (Trial Tr. 13:10-19). The Debtors eventually decided to open their store on Waikiki Beach in Honolulu, Hawaii, and soon thereafter began making preparations. (Trial Tr. 18:12-14).

1

After discussing the idea with Ray, Debtors secured financing for the store. Shawn operated an Illinois corporation named Shawn Renee Fashions, Inc. ("SRF") that sold merchandise and "did wedding shows," and Thomas had a thirty-year career as a mechanical engineer. (Trial Tr. 12:8-11, 11:3-4). Thomas received a severance package when his former employer was bought out in 2008. (Trial Tr. 11:10-15). Debtors also tapped their retirement and savings accounts to fund the flip-flop shop, resulting in about $400,000 of capital for the new business. (Trial Tr. 64:14-21).

Thomas drew up a business plan and set out to obtain financing from several financial institutions. Because the couple had no previous retail experience, however, Debtors were unable to obtain additional financing from a bank. (Trial Tr. 19:14-21). This led them to approach their relatives for loans for the store. (Trial Tr. 20:7-11). Thomas, who handled all the business's finances, estimated in his business plan that the startup costs to build out the store and acquire inventory would be approximately $750,000. (Trial Tr. 16:6-10, 20:18-20).

After obtaining $100,000 from Thomas' parents, Debtors approached Shawn's parents, Appellees/Cross-Appellants Clarence and Donna Campbell ("the Campbells"). (Trial Tr. 20:12-17). The Campbells initially agreed to loan Debtors $240,000. (Trial Tr. 20:15-17). Thomas then had an attorney in Chicago prepare the loan documents. (Trial Tr. 22:3-25:18). Debtors represented to the Campbells that they were receiving a security interest in Debtors' personal property. (Trial Tr. 24:17-24). A UCC-1 Financing Statement was filed in Illinois perfecting the Campbells' valid first lien. (Trial Tr. 25:2-10). Under the terms of the loan documents, Debtors were required to make interest-only payments to the Campbells at a rate of 15% until July 1, 2011, when the principal would become due. (Compl. Objecting Discharge 9, DN 13-1).

The Campbells wired $240,000 to SRF's business account on June 14, 2010. (Trial Tr. 26:6-19). Two days later, $200,000 was transferred from the SRF business account into the SRF savings account. (Trial Tr. 27:1-4) The $100,000 loan from Thomas' parents was also deposited into SRF's savings account. (Trial Tr. 27:4-13).

With their family's financing, Debtors began searching for real estate for the store, but the initial building and inventory costs were higher than Debtors anticipated. (Trial Tr. 27:21-24). Debtors then requested and received an additional $60,000 loan from the Campbells that was documented in an addendum to the original loan agreement. (Trial Tr. 28:10-22). Additionally, Debtors obtained an investment from Thomas' sister and brother-in-law of approximately $200,000. (Trial Tr. 30:8-12, 32:3-14, 33:12-19). This investment was documented similarly to the other family loans and contained a monthly payment schedule with interest.

The store did not open until April 2011, months later than the projected January open date. (Trial Tr. 28:2-9). The store was located in a high-end retail area on Waikiki Beach with a monthly rent of $16,000 on top of the $15,000-20,000 Debtors paid a realtor to find the location. (Trial Tr. 18:12-18, 104:23-105:3). Due to Debtors' miscalculations of startup costs, the business account's cash balance when the store opened was only $1,500. (Trial Tr. 34:18-23).

Debtors regularly transferred business account funds to cover their personal and living expenses. They paid themselves $8,000 per month in addition to hourly wages in order to have the business cover health insurance. (Trial Tr. 35:23-36:15). Debtors also lived at the Trump Hotel in Honolulu for seven months, for which the business paid $36,172. Debtors contended it was the only place they could live on short notice within a reasonable distance of the store. (Trial Tr. 61:6-12).

While Debtors lived at the Trump Hotel, they paid $9,579 for their son and a hired worker to stay at another hotel. (Trial Tr. 62:7-25). Bank records also show that in 2010, while they were trying to start the business, Debtors sent another son to a private camp at a cost of $30,000 from the business. (Trial Tr. 55:16-25).

Credit card transactions from the business account also contained several debit card withdrawals for personal expenses. Numerous purchases from QVC, Nordstrom, and other high-end retailers were made, but Shawn claimed she was buying products to use as samples to test consumer preferences for the store's inventory. (Trial Tr. 56:5-23). Shawn testified she would take ideas from these products and incorporate them into the designs of her own products. (Trial Tr. 87:20-89:12). Debtors had no licensing agreements or permission from retailers to display or resell their products. (Trial Tr. 60:2-5). Bank records also show $3,900 was spent at Chanel and $1,700 was paid to Chicago Cosmetic Surgery—neither of which Debtors could explain. (Trial Tr. 90:15-25). Seventy-three items were purchased online with corporate funds in 2010, and only twenty were returned to the sellers. (Trial Tr. 90:15-25). Shawn claimed, without any supporting documentation, that unreturned items were given to Ray in exchange for merchandise. (Trial Tr. 89:15-19).

Speaking of Ray, bank records also show numerous checks made payable to "cash" in February 2011 for $9,055; $4,410; $18,900; and $59,211.25. (Trial Tr. 37:2-7). Debtors testified these payments were for inventory and that Ray required wire transfers directly to his Wells Fargo account. (Trial Tr. 37:8-20). Without any supporting documentation, there was no way to trace these funds directly to inventory costs. Because Ray only gave the business a discount on inventory when bought in bulk, Debtors acquired excess inventory. (Trial Tr. 21:8-11).

The flip-flop venture flopped. Debtors realized in September and October 2011 that they would not make their projected sales goal and their gross sales did not cover their expenses. (Trial Tr. 39:10-23). By May 2013, Debtors had to close the store. (Trial Tr. 41:19-20). They forfeited their $120,000 security deposit on the store, sold the remaining business assets, and sold remaining inventory back to Ray at a loss. (Trial Tr. 41:21-42:8, 104:14-22). The Campbells, who had a lien on these assets and proceeds, received no payments. (Trial Tr. 41:21-42:8, 104:14-20).

Appellee/Cross-Appellant Donna Campbell ("Donna") testified that she saw packages from QVC in the store and that Thomas stated the items had been factored in the budget. (Trial Tr. 111:19-112:10). Donna further testified that she did not know that any of the money she and her husband loaned would be used for anything other than business expenses, or that the money would be used by Debtors for living expenses. (Trial Tr. 112:11-21).

Debtors made interest only payments on the loan to the Campbells from June 2010 to August 2011. Debtors did not make the principal payment due on July 1, 2011, but did make additional interest-only payments in 2012. (Trial Tr. 29:15-30:5). Debtors stopped paying on the loan in September 2012, leaving an outstanding balance of $328,589 owed to the Campbells. (Trial Tr. 29:25-30:5).

Debtors tendered an exhibit to support their claim that they personally invested $401,969 into the failed store from several different bank accounts. (Trial Tr. 64:2-16). At trial, Debtors acknowledged the exhibit was incorrect because those contributions were traced to the Campbells' loan. (Trial Tr. 64:14-76:21). Thomas testified he had lost many of the business records either because they were left behind in Hawaii or auctioned off when Debtors failed to pay storage fees in Chicago. (Trial Tr. 64:14-76:21). The Campbells obtained many of the records for this case

from third parties by subpoena, but Debtors produced little documentation showing how the loaned funds were used for the business. (Trial Tr. 75:5-25).

On March 13, 2015, the Campbells filed a complaint in Ohio state court against Debtors asserting claims for breach of contract, unjust enrichment and fraud in the inducement. *In re Butz*, No. 15-10340(1)(7), 2018 WL 314871, at *3 (Bankr. W.D. Ky. Jan. 5, 2018). On April 2, 2015, Debtors filed a Voluntary Petition seeking relief under Chapter 7 of the United States Bankruptcy Code. *Id*. On March 22, 2016, the Campbells initiated the adversary proceeding against Debtors now reviewed by this Court, seeking a judgment of nondischargeability and denial of Debtors' discharge. *Id.*

The United States Bankruptcy Court concluded that the debt owed to the Campbells was nondischargeable for four reasons. First, relying on 11 U.S.C. § 523(a)(2)(A), the Bankruptcy Court found that Debtors fraudulently induced the Campbells to loan them the money. There was "ample evidence that Debtors induced the Campbells to make the loans for use in the . . . business. In fact, however, the Debtors transferred funds loaned . . . into their own personal account and used such funds to pay their own lavish personal and living expenses." *Id*. at *4.

The Bankruptcy Court also found the debt nondischargeable under 11 U.S.C. § 523(a)(6) for willful injury to a third party. Because debts arising out of acts of conversion may satisfy the statutory standard, the Bankruptcy Court concluded that Debtors' use of loaned business funds for personal expenses amounted to willful and malicious injury to the Campbells. *Id.* at *5.

Third, relying on 11 U.S.C. § 727(a)(3), the Bankruptcy Court denied discharge because Debtors failed to keep adequate business records. Debtors failed to produce documents the Bankruptcy Court had previously ordered them to produce, including federal and state tax returns, bank records, and a check ledger for SRF. *Id.* at *6. Many of the documents were housed in

storage units in Hawaii and lost when their contents were auctioned off after Debtors failed to pay storage fees. *Id*. The Bankruptcy Court noted that, although many of the documents were obtained by the Campbells through subpoena, it was Debtors' duty to furnish those records. *Id*. The Bankruptcy Court also considered the circumstances in evaluating the adequacy of Debtors' records and concluded they were deficient in light of Debtors' status as "well educated, sophisticated business people." *Id*.

Fourth, the Bankruptcy Court exercised its discretion under 11 U.S.C. § 727(a)(6)(A) in finding Debtors refused to obey the order requiring them to produce business records. Because Debtors could not show compliance with the order was beyond their control or impossible and, because "[t]he overwhelming weight of the evidence [suggested] that Debtors lacked candor and credibility," the Bankruptcy Court concluded they were not entitled to discharge. *Id*. With this, the Bankruptcy Court ordered Debtors to pay the Campbells the sum of $328,589, plus interest at the rate of 15% per annum. *Id.* at *7.

Debtors then moved to alter, amend or vacate the judgment. *In re Butz*, No. 15-10340(1)(7), 2018 WL 1895689, at *1 (Bankr. W.D. Ky. Apr. 19, 2018). The Bankruptcy Court denied the motion with regard to nondischargeability but amended the interest rate attached to the debt. *Id.* at *3. The Bankruptcy court clarified that "any interest awarded is pre-judgment interest on the debt until September of 2012, for a total debt of $328,589.00." *Id.* The Bankruptcy Court did not award post-judgment interest because the Campbells did not request it. *Id.*

In the present action, Debtors again challenge Bankruptcy Court's ruling concerning dischargeability. First, Debtors argue that the Bankruptcy Court's decision is contrary to the uncontroverted evidence that they "overspent and miscalculated the costs of opening and operating a retail store on Waikiki Beach." (Appellants/Cross-Appellees' Reply Br. 8, DN 16;

7

Appellants/Cross-Appellees' Br. 5, DN 10). Debtors argue that, "[w]hile certain minimal personal expenses were paid, considering the substantial funds expended in opening the store, the evidence clearly demonstrates that a significant amount in excess of the Campbells' loan(s) were used for legitimate business purposes." (Appellants/Cross-Appellees' Reply Br. 9). Second, Debtors essentially argue that it is not their fault business records were missing because they either lost possession of documents by failing to pay storage fees or because they could not afford to obtain the records from Hawaii. (Appellants/Cross-Appellees' Reply Br. 12). Debtors argue that because they provided numerous business records, the debt should not be rendered nondischargeable for failure to produce other records. (Appellants/Cross-Appellees' Br. 12).

The Campbells cross-appealed the Bankruptcy Court's decision regarding interest. They argue that under Kentucky law prejudgment interest follows as a matter of right if the claim is liquidated. (Appellees/Cross-Appellants' Br. 19-20, DN 11). Additionally, the Campbells argue that they are entitled to post-judgment interest as a matter of right pursuant to 28 U.S.C. § 1961. (Appellees/Cross-Appellants' Br. 22).

## II. JURISDICTION

District courts have jurisdiction to hear appeals from final judgments, orders, or decrees from bankruptcy courts. 28 U.S.C. § 158(a)(1).

## III. STANDARD OF REVIEW

On appeal, the bankruptcy court's conclusions of law are reviewed *de novo* and factual findings are reviewed for clear error. *In re M.J. Waterman & Assocs., Inc.*, 227 F.3d 604, 607 (6th Cir. 2000) (citation omitted). "Under a *de novo* standard of review, the reviewing court decides an in issue independently of, and without deference to, the trial court's determination." *In re Morgeson*, 371 B.R. 798, 800 (B.A.P. 6th Cir. 2007) (citation omitted). "A finding of fact is

clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *In re DSC, Ltd.*, 486 F.3d 940, 944 (6th Cir. 2007) (citations omitted). "Mixed questions are to be separated into their component parts and reviewed under the appropriate standard." *In re Behlke*, 358 F.3d 429, 433 (6th Cir. 2004) (citation omitted).

## IV. DISCUSSION

### A. Dischargeability

Debtors do not appear to challenge the Bankruptcy Court's factual findings, but instead contend that those facts do not support the legal conclusions reached by that court. Accordingly, this Court will review the Bankruptcy Court's legal conclusions *de novo*. *See In re Morgeson*, 371 B.R. at 800.

#### 1. *11 U.S.C. 523(a)(2)(A)*

The Bankruptcy Court first determined Debtors' debt was nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 727. *In re Butz*, 2018 WL 314871, at *3. Section 523, which is titled "Exceptions to discharge," enumerates scenarios in which a debt may not be discharged under 11 U.S.C. § 727 and other statutes. 11 U.S.C. § 523(a). Section 523(a)(2)(A) more specifically provides that no discharge shall issue for debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ." 11 U.S.C. § 523(a)(2)(A).

To be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), the Sixth Circuit has required creditors to prove by a preponderance of the evidence four elements:

> "(1) the debtor obtained money through a material representation that, at the time, the debtor knew was false or made with clear recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of the loss."

9

*In re Rembert*, 141 F.3d 277, 280-81 (6th Cir. 1998) (citation omitted). Exceptions to discharge are to be "strictly construed against the creditor." *Id.* (citation omitted).

The first prong of the Sixth Circuit's four-pronged test is satisfied when: "(1) the debtor received money; (2) that was procured through material misrepresentations by the debtor to the creditor; and (3) at the time the debtor made the representations, he either knew that they were erroneous, or he was reckless in failing to determine their veracity." *In re Copeland*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003). Here, Debtors received money from the Campbells as a result of representations that the flip-flop shop would be profitable, but Debtors began spending the money earmarked for business costs on extravagant personal expenses before the store even opened. The record is replete with such evidence, including purchases from high-end retailers like Chanel and Prada, sending their son to a $30,000 camp, and spending over $35,000 for Debtors' several-months-long stay at the Trump Hotel. (Trial Tr. 58:1-5, 55:18-20, 62:9-18). The timing of these lavish expenditures certainly supports the Bankruptcy Court's conclusion that Debtors obtained loans from the Campbells based on material misrepresentations concerning their plans for the flip-flop shop, or alternately, with recklessness regarding its viability. The first prong of the Sixth Circuit's test is accordingly satisfied.

The second element is also satisfied because there is evidence that Debtors intentionally induced the Campbells to make the loan. "[A] debtor's intention—or lack thereof—must be ascertained by the totality of the circumstances." *In re Rembert*, 141 F.3d at 282 (citation omitted). "What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *Id.* (internal quotation marks omitted) (citation omitted). Based on the totality of the circumstances here, Debtors' spending supports the conclusion that they intended to deceive the Campbells. Debtors took

$80,000 in funds from the business account for their own personal expenses and used $30,000 to send their son to a camp in 2010—long before the store opened in April 2011. (Trial Tr. 55:6-20). Additionally, Debtors paid themselves a generous salary of nearly $100,000 per year using loaned funds, on top of an hourly wage so that they could have the business pay for health insurance. (Trial Tr. 35:23-36:15).

The third element is satisfied because the Campbells justifiably relied on Debtors' false representations. Debtors argue "[t]he Campbells knew there was risk involved" because they "were advised by their financial advisor not to make the loan" and "knew that [b]anks were unwilling to make [Debtors] a loan." (Appellants/Cross-Appellees' Br. 11-12). Additionally, Debtors contend "[t]he Campbells knew their daughter and son-in-law were without jobs [and] would have to use some of the funds for start-up costs." (Appellants/Cross-Appellees' Br. 11). These arguments ignore facts justifying the Campbells' reliance. For one, Thomas's education and professional background as a mechanical engineer gave the Campbells, as the Bankruptcy Court said, "no reason to believe their money would be used for anything but the business as was represented by the Debtors." *In re Butz*, 2018 WL 314871, at *5. Second, Thomas drew up extensive business plans projecting profits for the flip-flop shop. (Trial Tr. 14:3-13). Third, Debtors assured the Campbells that the loan was personally guaranteed by Debtors and was of no risk to the Campbells. (Trial Tr. 23:3-13). Based on these facts, the Court agrees with the conclusions of the Bankruptcy Court and finds that the Campbells justifiably relied on Debtors' false representations.

The fourth element is also satisfied because there is a clear link between Debtors' false representations and the debt they continue to owe the Campbells. Debtors undermined the business by using considerable loan proceeds on excessive personal spending which nearly emptied the

business's coffers before the store opened. (Trial Tr. 34:18-23). Taken altogether, the Bankruptcy Court's determination that the four-element test was satisfied is not clearly erroneous. Debtors' debt to the Campbells therefore was properly excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

### 2. *11 U.S.C. § 523(a)(6)*

The Bankruptcy Court next concluded that Debtors were excepted from discharge for willfully and maliciously injuring the Campbells. Section 523(a)(6) provides that a debtor will not receive a discharge under 11 U.S.C. § 727 from debt "for willful and malicious injury by the debtor to another entity or the property of another entity . . . ." 11 U.S.C. § 523(a)(6).

"The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). "[C]ourts have split over whether willful and malicious injury is established solely by proving intentional injury, or whether 'willful' requires a finding of intentional injury and 'malicious' requires that the act without just cause or excuse." *In re Sweeney*, 264 B.R. 866, 870 (Bankr. W.D. Ky. 2001) (citation omitted). In the Sixth Circuit, "the Creditor must demonstrate that the Debtor either (1) intended to cause injury to the Creditor or the Creditor's property, or (2) engaged in an intentional act from which the Debtor believed injury would be substantially certain to result." *Id.* (citing *In re Markowitz*, 190 F.3d 455, 464 (6th Cir. 1999)). With this, courts in the Sixth Circuit have found debts nondischargeable which arise out of acts of conversion where the debtor either intended to cause injury or injury was substantially certain to result. *See, e.g.*, *In re Walters*, 359 B.R. 156, 161-62 (Bankr. E.D. Ky. Aug. 28, 2006) (debtor denied discharge for removing kitchen equipment belonging to lessor-Plaintiff of restaurant space because of willful injury via conversion); *In re Harr*, Nos. 97-17560,

12

ADV. No. 98-1182, 2000 WL 620799, at *6 (S.D. Ohio Mar. 24, 2000) (son's conversion of mother's assets was substantially certain to injure her and her estate and was thus nondischargeable); *In re Williams*, 233 B.R. 398, 405-06 (Bankr. N.D. Ohio 1999) (debtor-homeowner denied discharge because intentionally injured home repair contractor by withdrawing funds from account earmarked for repairs). "Since a Debtor in a § 523(a)(6) case is unlikely to admit he or she intended to cause injury, or that he or she was substantially certain an injury would result, this state of mind can be established through circumstantial evidence." *In re Sweeney*, 264 B.R. at 872 (citation omitted).

Similar to *In re Williams*, Debtors took funds earmarked for business expenses and used those funds to foot lavish personal bills. *See In re Williams*, 233 B.R. at 404. Like the converted kitchen equipment in *In re Walters*, Debtors sold store inventory and failed to apply the proceeds toward what they owed the Campbells. *See In re Walters*, 359 B.R. at 162. Taken together, the clear weight of the evidence supports the finding that Debtors engaged in intentional acts from which injury was substantially certain to the Campbells. *See In re Sweeney*, 264 B.R. at 870. Accordingly, the Bankruptcy Court properly determined that the debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

### 3.   *11 U.S.C. § 727(a)(3)*

The Bankruptcy Court next concluded Debtors were not entitled to discharge for failing to comply with statutory recordkeeping requirements. Section 727(a)(3) provides that the Court may deny discharge where "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information . . . unless such act or failure to act was justified under all of the circumstances of the case . . . ." 11 U.S.C. § 727(a)(3). Debtors are required to provide creditors "with enough information to ascertain the debtor's financial condition and track his

financial dealings with substantial completeness and accuracy for a reasonable period past to present." *In re Ross*, 367 B.R. 577, 581 (W.D. Ky. 2007) (internal quotation marks omitted) (citation omitted). The extent to which a debtor must maintain records depends on the sophistication of the debtor—a more sophisticated debtor has a higher level of accountability in recordkeeping. *Id.* (citation omitted). The party objecting to discharge has the burden to establish by a preponderance of the evidence that the debtor should be denied a discharge. *Id.* Once a debtor's records are deemed inadequate, however, the burden returns to the debtor to justify the inadequacy. *Id.*

On August 25, 2015, the Bankruptcy Court entered an Order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure requiring Debtors to produce certain documents including: 2010 federal and state tax returns, the 2010 and 2013 corporate tax returns for SRF, the business's bank statements from 2010 through 2014, a check ledger for SRF, and bank records showing the deposit of the Campbells' loan into SRF's account. *In re Butz*, 2018 WL 314871, at *6.

There is no question Debtors are sophisticated parties considering Thomas' education and professional background and Shawn's prior business experience. As such, Debtors would have been expected to keep reasonably comprehensive records. Instead, the recordkeeping here was seriously deficient and even a person of average capabilities would know to maintain records which Debtors failed to produce. To justify the lack of records, Debtors place blame with the storage facility in Chicago which sold their records after they failed to pay storage fees and with their accountant whose fees they could not afford. (Appellants/Cross-Appellees' Br. 14-15). This argument is unpersuasive, however, because it ignores the glaring condition precedent to their predicament: it was Debtors' fault that the storage company destroyed the documents because Debtors did not pay the required fees after squandering the loan proceeds on personal expenses.

14

Missing basic business documents like tax returns and check ledgers shows, as the Bankruptcy Court noted, "either an utter disregard for the complexities of the venture they undertook using hundreds of thousands of dollars of their relatives' money or purposeful deceit." *In re Butz*, 2018 WL 314871, at *6. Without a more compelling justification for the lack of business records, the Bankruptcy Court correctly deemed the debt nondischargeable pursuant to 11 U.S.C. § 727(a)(3).

### 4.     *11 U.S.C. § 727(a)(6)(A)*

The fourth and final ground upon which the Bankruptcy Court denied discharge is found in 11 U.S.C. § 727(a)(6)(A), which enables the Court to deny discharge where the debtor refuses "to obey a lawful order of the court to respond to a material question or to testify . . . ." 11 U.S.C. § 727(a)(6)(A). As described above the Bankruptcy Court instructed Debtors to produce certain relevant business documents. The Bankruptcy Court noted that Debtors never challenged the validity of that Order. *In re Butz*, 2018 WL 314871, at *6.

"Many courts have used the same test for civil contempt to determine if a debtor has refused to obey an order for § 727(a)(6)(A) purposes." *In re Settembrei,* 425 B.R. 423, 433 (Bankr. W.D. Ky. 2010) (citation omitted). To find civil contempt, three elements must be established: "(1) the alleged contemnor had knowledge of the order which he is said to have violated; (2) the alleged contemnor did in fact violate the order; and (3) the order violated must have been specific and definite." *In re Magack*, 247 B.R. 406, 410 (Bankr. N.D. Ohio 1999) (citing *Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998); *In re Temple*, 228 B.R. 896, 897 (Bank. N.D. Ohio 1998)).

There is no real dispute that the Campbells met their burden of proof regarding these three elements: Debtors had knowledge of the order, they violated that order by not producing records, and the records ordered to be produced were clearly delineated. This is not the end of the analysis, however, because "[i]mpossibility or an inability to comply with a judicial order is a valid defense

15

to a charge of civil contempt." *In re Settembre*, 425 B.R. at 434 (citing *United States v. Bryan*, 339 U.S. 323, 330-34 (1950)). "Such a defense requires that the person charged with contempt to have exercised due diligence and, through no fault of their own, is still unable to comply with the order." *Id.* Debtors defend their noncompliance with the Order by pointing out that the records were lost when they did not pay storage fees and their accountant. (Appellants/Cross-Appellees' Br. 14-15).

Debtors' argument is unpersuasive. That the Campbells were able to obtain from third parties some of the documents ordered to be produced by Debtors discredits Debtors' argument that they were unable to comply with the Bankruptcy Court's Rule 2004 Order. If the Campbells were able to get these documents by subpoena, then so could have the Debtors if they had made the effort. Even if the records were unobtainable, the inaccessibility of the records is squarely the fault of Debtors because they failed to pay storage fees and did not pay their accountant. Again, the Bankruptcy Court correctly ruled on this issue.

  **B.**  **Interest**

The Campbells challenge the Bankruptcy Court's conclusions regarding pre- and post-judgment interest. (Appellees/Cross-Appellants' Br. 18). Following the Bankruptcy Court's initial entry of judgment, Debtors moved to alter, amend, or vacate the Bankruptcy Court's decision on discharge and to correct the prejudgment interest rate to be the rate set forth in 28 U.S.C. § 1961, not the 15% contract rate. *In re Butz*, 2018 WL 1895689, at *1. The Bankruptcy Court granted Debtors' motion in part, awarded prejudgment interest at the contract rate of 15% through September 2012, and did not award post-judgment interest because the Campbells did not request it. *Id*. at *3.

In their cross-appeal, the Campbell's argue that because their claim is liquidated, Kentucky law instructs that prejudgment interest follows as a matter of right. (Appellees/Cross-Appellants' Br. 20). Although Kentucky's prejudgment interest rate is 8% per annum, the Campbells posit that KRS 360.010 permits the parties to agree to a different interest rate, which in turn entitles them to 15% interest as provided in their loan agreement with Debtors. (Appellees/Cross-Appellants' Br. 20-21). Additionally, the Campbells seek to obtain post-judgment interest at the federal rate set forth in 28 U.S.C. § 1961. (Appellees/Cross-Appellants' Br. 22). Debtors, on the other hand, argue that Illinois law—which is specified in the loan agreement—places the question of awarding prejudgment interest within the discretion of the trial court. (Appellants/Cross-Appellees' Reply Br. 14-15). Debtors maintain the Bankruptcy Court's decision regarding interest should be left undisturbed.

In cases based on federal diversity jurisdiction, the issue of post-judgment interest is governed by federal law, while prejudgment interest is governed by state law. *Gen. Elec. Co. v. Anson Stamping Co.*, 426 F. Supp. 2d 579, 596 (W.D. Ky. 2006). In cases based on federal question jurisdiction, however, "the determination of the prejudgment interest rate [is] within the sound discretion of the district court." *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998). Awards of prejudgment interest "are not punitive, but simply compensate a beneficiary for the lost interest value of money wrongly withheld from him or her." *Id.* at 618 (citation omitted).

The Bankruptcy Court's decision to award prejudgment interest at the contract rate through September 2012 equates to a contractual damages remedy because the Campbells were entitled to that interest under their written agreements with Debtors. With an eye toward compensating the Campbells for the time value of money withheld from them, the Bankruptcy Court did not abuse its discretion in awarding the Campbells prejudgment interest at the 15% rate specified in the loan

agreement. Unlike the Bankruptcy Court's ruling, however, prejudgment interest is properly awarded through January 5, 2018, the date of the judgment in the Campbells' adversary proceeding. *See Fulk v. LVNV Funding LLC*, 55 F. Supp. 3d 967, 973 (E.D. Ky. Oct. 21, 2014) ("[A] creditor may not collect prejudgment interest from a debtor until a judgment has been awarded.").

"[T]o avoid the complexities of compounding interest[,]" and to insure the prejudgment rate is not punitive, the interest rate will be simple and not compound. *Ford*, 154 F.3d at 619 (internal quotation marks omitted) (citation omitted). Also, contrary to the Bankruptcy Court's ruling, post-judgment interest should be awarded as a matter of right. *See Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir. 2002) ("Under 28 U.S.C. § 1961, district courts are required to award post[-]judgment interest."); *Bricklayers' Pension Tr. Fund v. Taiariol*, 671 F.2d 988, 989 (6th Cir. 1982) (stating the 28 U.S.C. § 1961 "mandates the imposition of post-judgment interest, thus removing the award of such interest from the [court's] discretion . . . ." (citations omitted)). Therefore, the Court will additionally award post-judgment interest at the rate specified in 28 U.S.C. § 1961 from the date of the Bankruptcy Court's judgment.

## V. <u>CONCLUSION</u>

For the reasons set forth above, the Bankruptcy Court's decision is **AFFIRMED IN PART** and **REVERSED IN PART**. The Bankruptcy Court's conclusions regarding dischargeability are affirmed. The Bankruptcy Court's conclusions regarding pre- and post-judgment interest are reversed. The Court accordingly awards as follows:

1. Appellees/Cross-Appellants are entitled to $328,589 under the terms of the loan agreement through September 2012.

18

2. Appellees/Cross-Appellants are entitled prejudgment interest at the per annum simple rate of 15% for the dates between September 1, 2012, and January 5, 2018; amounting to $263,591.40, bringing the total prejudgment assessment to $592,180.40.

3. Appellees/Cross-Appellants are entitled to post-judgment interest at the compounding rate of 1.76% as provided in 28 U.S.C. § 1961.

IT IS SO ORDERED.

Greg N. Stivers, Chief Judge
United States District Court

May 2, 2019

cc: counsel of record